## Estate of Joseph Kajut

*Ned J. Nakles,* for proponents.
*John G. Kish,* for contestants.

McCORMICK, *P.J.,* April 3, 1981 — Decedent Joseph Kajut died on September 29, 1979; he was

an unmarried widower with no children. His will was dated August 10, 1979 and was admitted to probate on September 17, 1979. Proponents Al Wiklendt and Regis Cashell were named executors and letters testamentary were issued to them.

Mary Kajut and Apolonia Lewandowski began this will contest by appealing from the probate of Joseph Kajut's will. They alleged that they were children of Joseph Kajut's father Thomas Kajut and his second wife Anna Boncel. As such, they allege to be stepsisters of decedent and entitled to a one-sixth intestate interest in his estate.

Both Mary Kajut and Apolonia Lewandowski were born before the alleged marriage of Thomas Kajut to their mother, Anna Boncel. Mary Kajut was born to Anna Boncel out-of-wedlock on June 27, 1920. Anna Boncel began a paternity suit against one Harry Melnik on February 18, 1920, accusing him of being the father of Mary. Then, on July 4, 1920, Anna Boncel took her daughter Mary 40 miles away to Ford City to be baptized, naming Thomas Kajut as the father on the baptismal certificate. Thereafter, on June 11, 1921, Harry Melnik pleaded guilty to the paternity charge and was sentenced in Westmoreland County to pay support as Mary's father.

Mary Kajut refused to appear for scheduled depositions on two occasions, and an order of sanctions was issued by the court on April 30, 1980, prohibiting any evidence relative to her pedigree. On December 18, 1980, the date of the last hearing, summary judgment was granted by this court against the claim of Mary Kajut and no appeal has been taken.

There remains the issue of the standing of Apolonia Lewandowski to contest the will of Joseph Kajut. Apolonia Lewandowski was born April 16,

1922 in Bydgoszcz, in western Poland, more than one year before the alleged marriage of her mother to Thomas Kajut in Warsaw on April 19, 1923. Although there was doubt raised about the admissibility of the Polish marriage certificate, for the purposes of this opinion it will be assumed that the marriage actually took place. At the time of Apolonia's birth and the later marriage of Thomas Kajut and Anna Boncel, all of the parties were domiciled in western Poland. Thomas Kajut returned to Poland in 1921 and remained there until his death in 1937.

Contestants argue that the law of Pennsylvania should determine the legitimating effect of the subsequent marriage on the status of Apolonia Lewandowski. However, all of the operative facts occurred in Poland, and the court concludes that Polish law must be applied. Although Apolonia had the burden of proving her legitimation and consequently her standing in this case, she presented no evidence of Polish law on the subject.

By the choice of law rules, Pennsylvania must first decide which law applies. Thomas Kajut was at all relevant times a domiciliary of western Poland, and it is his relationship to Apolonia that is in question. In Thorn's Estate, 353 Pa. 603, 611, 46 A. 2d 253, 263 (1946), the Supreme Court of Pennsylvania, in a case involving legitimation stated:

"They were thus legitimated according to the law of Indiana and it is well established that the status of legitimacy is created by the law of the domicile of the parent whose relationship to the child is in question: Restatement, Conflict of Laws, §137; McCausland's Estate, 213 Pa. 189, 62 A. 780; Moretti's Estate, 16 D. & C. 715; Miller v. Miller, 91 N.Y. 315; Olmsted v. Olmsted, 190 N.Y. 458, 464, 465, 83 N.E. 569, 570."

Allen v. Califano, 452 F. Supp. 205, 216 (D.Md. 1978), reviewed Pennsylvania cases on the question of applicable law in legitimation cases. Speaking of the parent whose relationship to the child is in question, the court concluded that Pennsylvania law "indicated that the domicile of that parent at the time of the birth of the child was to provide the applicable law." The same rule requiring the application of Polish law is stated in Restatement, Conflicts, §287, comment f.: ". . . Usually, the parent and the child will be domiciled in the same state. If so, the local law of this state will be applied to determine whether the child is legitimate with respect to the parent." It follows that Pennsylvania should decide Apolonia's legitimacy under the law prevailing in western Poland at the time of the operative events.

Proponents of the will presented the only testimony of Polish law. They called Dr. Dominik Lasok, an expert in Polish law from the University of Exeter in England. Dr. Lasok was eminently qualified to testify on the subject; he has written a book titled Polish Family Law and more than 40 articles relating to family law and conflicts of law. He is a law professor at Exeter and the Director there of the Center for European Legal Studies. He has lectured on family law and legitimation in America and France, and specifically on Polish family law in South Africa. His qualifications were conceded by contestants.

According to Dr. Lasok's testimony, Bydgoszcz was situated in Western Poland, and in the decade of the 1920s it was governed by the German Civil Code which remained in effect until 1946. Warsaw was in central Poland and was governed by the Napoleonic Code and the Marriage Laws of 1836. Even under Polish law, the determination of the

legitimacy of a child born before the marriage of the child's parents was determined by the domiciliary law of the father. Under Polish law, Thomas Kajut was domiciled in Bydgoszcz and was a Polish citizen. Dr. Lasok testified that a Warsaw religious marriage would be recognized as valid in Bydgoszcz. However, that marriage alone would not effect the legitimation of Apolonia under the applicable German Civil Code.

The requirements of the German Civil Code relating to legitimation were explained by Dr. Lasok in detail. Legitimation by subsequent marriage is effected only upon the satisfaction of two requirements: cohabitation, and the father's recognition of paternity in a public record. He testified that the presumption of paternity "does not exist in the case of a child born out of wedlock and therefore has to be supported by some form of recognition." Professor Lasok concluded that the Warsaw marriage, under all of the circumstances of this case, did not effect the legitimation of Apolonia Lewandowski because of the absence of public recognition required under the German Civil Code. Contestants presented no evidence in opposition to the testimony of Professor Lasok, and the court found his testimony completely credible.

Contestants point to testimony of Apolonia that on one occasion Joseph Kajut called her "sister," and that Joseph administered Thomas' estate in America and that a portion was distributed to Apolonia as an heir to Thomas. This testimony is diluted by the fact that Joseph Kajut lived in America, and Apolonia's birth and the subsequent marriage took place in Poland. Joseph had no first hand knowledge of any of the events of Appolonia's life. Moreover, Apolonia always called Joseph "Uncle."

Inasmuch as Apolonia Lewandowski was born prior to the marriage of her parents, and was not legitimated under Polish law, she is not the stepsister of Joseph Kajut and has no standing in this case.

Walter Cashall, another heir of decedent Joseph Kajut, has joined in the petition appealing the probate of the will. Although many allegations were made relative to undue influence and lack of testamentary capacity of decedent, these allegations were apparently abandoned. The evidence is clear that decedent, though aged and physically infirm and blind, was still of brilliant intellect and knew precisely what his estate consisted of and the objects of his bounty. At age 89, he was still operating his business and was actively investing in the stock market until immediately before his death.

Contestants called decedent's broker as a witness. The broker was a long-standing friend of decedent, and he visited decedent in the hospital just six days before the will was executed. He talked to him that day for two and one-half hours or more; he saw nothing that indicated anything but a sound mind. The broker testified: ". . . He was as bright then as at anytime I have known him . . . Extremely bright." He agreed that "[e]specially in matters relating to the stock market, he had a special native brilliance." Further, decedent "was a very strong willed and determined person" and "He was his own boss." The broker was asked if decedent knew what his stock portfolio consisted of; he replied: "He certainly did; he knew everything about his stocks, what they were worth one day to the next, whether they were up a quarter or down an eighth; he knew." Asked to describe decedent's ability to analyze a company's financial position in comparison to the value of the stock, the broker answered, "Brilliant." Asked about decedent's

mental faculties six days before the will, the broker answered, ". . . he was as clear and distinct as he ever was."

Gloria Mateya is an intestate heir of decedent who testified for proponents, knowing that she would receive a far more substantial amount if the will were invalidated. Testifying against her financial interests, she stated that decedent knew well what he was doing and that the will expressed his exact desires. She was present in the room when the will was executed.

Contestants presented no evidence supporting their allegations of fraud, undue influence or duress. All of the convincing evidence indicates that the will was the free act of the testator and accurately expressed his intentions.

The final argument of contestants is that the will was not executed in strict technical compliance with section 2502(2) of the Probate, Estates and Fiduciaries Code, 20 Pa.C.S.A. §2502(2):

"Signature by mark. If the testator is unable to sign his name for any reason, a will to which he makes his mark and to which his name is subscribed in his presence before or after he makes his mark, shall be as valid as though he had signed his name thereto: Provided, that he makes his mark in the presence of two witnesses who sign their names to the will in his presence."

Contestants argue that testator's name was typed on the will out of his presence, and that the requirement that "his name is subscribed in his presence before or after he makes his mark" has not been met. The court is not unaware of the cases cited by contestants to support this technical argument.

However, a proper analysis of this issue requires

some exploration of the purposes of the Wills Act requirement of subscription of testator's name in his presence when he signs by mark. So far as the court can determine, little has been written about the purpose for the rule, and research in this area is not particulary revealing. There are apparently three reasons variously given for requiring the subscription of testator's name. The first is the obvious need for identifying the will; the mark, alone, does not identify the testator. The next reason may be to avoid the fraud of having the name of someone other than the testator placed on the will after the mark is made and outside of testaor's presence. The third reason suggests that the testator should see the subscription so that his authorization may be implied; Bregy expresses this reason in this manner:

". . . it was said that the subscription should at least take place where testator could see it for the implication of authorization to arise." Intestate, Wills and Estates Act of 1947, p.2208, nll; and in Gerard Trust Co., 282 Pa. 174, 176-77, 127 A. 458. 459 (1925), a similar rationale is suggested: ". . . authority may be inferred from the fact that testator saw the name written, and then signified his approval of the act by placing his mark under the signature."

There are critical facts involved in this case distinguishing it from the cases cited by contestants where wills were invalidated because the testator's name was subscribed out of his presence. The salient fact is that the testator was blind, and could not have seen his name subscribed in any event. The name of testator was typed on each of the three pages of the will. The attorney who prepared the will told the testator that his name was typed on the will on each of the three pages; the testator under-

stood that, and it was then that the testator made his mark above the typed signature. The attorney concluded that testator adopted "the typed signature as his own as though it were done in his presence."

There was no problem of identifying the will because testator's name appeared in the introductory paragraph and beneath the signature line on all three pages. Next, there is not even the suggestion of any fraud involved. Finally, whatever authority is inherent in having the testator "see" his signature subscribed in his presence has no meaning in this case because of the testator's blindness.

It is the conclusion of the court, under the particular circumstances of this case, that the requirements of section 2502(2), 20 Pa.C.S.A. §2502(2) were met. At the very least, there was substantial compliance with the Wills Act requirements sufficient for a court to refuse to invalidate a will which obviously expressed the testator's intention concerning the distribution of his estate. Form should not be raised above substance to destroy a will.

## FINDINGS OF FACT

1. Joseph Kajut's will was dated August 10, 1979. He died September 12, 1979, and his will probated September 17, 1979. Letters Testamentary were issued to Al Wiklendt and Regis Cashell.

2. Joseph Kajut was an unmarried widower and had no children.

3. Apolonia Lewandowski and Mary Kajut appealed the probate of Joseph Kajut's will, each claiming to be entitled to one sixth of the intestate estate and half-sister of decedent. Each claimed that Thomas Kajut, the father of Joseph Kajut, then a widower, entered into a second marriage with

their mother, Anna Boncel, in Warsaw, Poland, on April 19, 1923.

4. Mary Kajut was born June 27, 1920, and Apolonia Lewandowski was born on April 16, 1922. Both were born before the alleged marriage of their mother to Thomas Kajut on April 19, 1923.

5. Thomas Kajut was born before the turn of the century in Bydgoszcz, a city in western Poland. He came to America and lived in Westmoreland County, Pa. for many years. Anna Boncel was born in Poland. She came to America as a young girl and worked in Thomas Kajut's hotel.

6. A daughter, Mary, was born to Anna Boncel, out-of-wedlock, on June 27, 1920. On February 18, 1920, Anna began a paternity suit against one Harry Melnik, accusing him of being Mary's father. On July 4, 1920, Anna Boncel took Mary to Ford City, some 40 miles away, to be baptised there. On the baptismal certificate, she named Thomas Kajut as the father of Mary. Thereafter, on June 11, 1921, Harry Melnik pleaded guilty in the Westmoreland County paternity suit, and was sentenced to pay support as the father of Mary.

7. Mary Kajut has withdrawn her claim and summary judgment was granted against her.

8. Thomas Kajut returned to Bydgoszcz in 1921, and Anna Boncel followed him there several months later. Apolonia Lewandowski was born in Bydgoszcz more than one year before the alleged marriage of Thomas and Anna in Warsaw on April 19, 1923.

9. Thomas Kajut intended to remain in Bydgoszcz. He purchased real estate and remained there until his death in 1937.

10. During the 1920's Poland was governed by four legal systems. The German Civil Code applied in the western provinces, and Bydgoszcz was

situated there; the Napoleon Code and the Marriage Law of 1836 applied in central Poland, where Warsaw was situated. Although not applicable here, eastern Poland was governed by Russian law and Austrian law prevailed in southern Poland.

11. Under Polish choice of law rules, the legitimating effect of a marriage is determined by the law of the domicile of the father. Thomas Kajut was domiciled in Bydgoszcz, where the German Civil Code controlled.

12. Under the applicable provisions of the German Civil Code, legitimation by subsequent marriage is effected only by proof of cohabitation and evidence of documentary recognition of paternity.

13. Thomas Kajut never made any documentary recognition of the paternity of Apolonia Lewandowski, as required to effect her legitimation under the applicable German Civil Code provisions. He made no public recognition of the paternity of Apolonia either at birth or at marriage and he executed no formal recognition document relating to her.

14. Thomas Kajut never adopted Apolonia Lewandowski.

15. Joseph Kajut, born in Poland in 1887, came to America when he was three years old. His only visit to Poland was in 1928. He had no personal knowledge of the actual relationships of Mary, Apolonia, Anna and Thomas. The only information he had of the marriage and the births of the children was learned from other people.

16. Thomas Kajut died in 1937. Apolonia Lewandowski came to America on May 13, 1958. She petitioned the Orphans' Court of Westmoreland County to get money from Thomas Kajut's estate. The money was held in escrow because she was a resident of an iron curtain country. In the

petition, she was not required to present any proof or legal documents that she was the child of Thomas Kajut.

17. The executors named in Joseph Kajut's will saw him on nearly a daily basis, and helped him in many ways. Regis Cashell was a grand-nephew of decedent. Al Wiklendt was a close friend of decedent for many years. Joseph Kajut's wife, Rosa, was a diabetic, and for at least twelve years before she died in 1970, he administered insulin shots to her at least once a day.

18. Gloria Mateya, a niece of decedent, cared for him after he was injured in a fall, and he lived at her home until his death.

19. Joseph Kajut requested Al Wiklendt to call William F. Nee, Esq. to come to Gloria's house to prepare a will for him. On August 9 and 10, 1979, Mr. Nee made four visits to decedent's bedside. Decedent, although blind, knew precisely what he wanted in his will. He dictated from memory a fairly complicated plan to leave his estate to many individuals in fractions of 30ths.

20. The will was signed by mark, and properly witnessed by Mr. Nee and a neighbor. The name of decedent was already typed on each page of the will below the line which contained the space for decedent's mark. Mr. Nee brought to decedent's attention the fact that decedent's name was on each page of the will, so that decedent adopted "the typed signature as his own as though it were done in his presence."

21. At the time of the execution of the will, the testator was 92 years of age and blind. Nonetheless, he had a brilliant mind. He knew the full extent of his stock holdings in detail and other assets of his estate. He knew precisely the objects of his bounty. He was strong-willed and not subjected to undue

influence. There was no duress or fraud involved in the preparation or execution of the will.

22. Joseph Kajut's will accurately reflected his intention and desire for the distribution of his estate, and he apparently executed it believing that it would be valid.

## CONCLUSIONS OF LAW

1. A summary judgment was issued against Mary Kajut's claim and she has no standing to contest the will of decedent.

2. Under the applicable provisions of the German Civil Code, Apolonia Lewandowski, born out-of-wedlock, was not legitimated by the alleged subsequent marriage of her parents. The provisions of the German Civil Code setting forth the requirements for legitimation by subsequent marriage were not met.

3. Apolonia Lewandowski is not the legitimated daughter of Thomas Kajut. She is not the stepsister of decedent, and consequently has not standing to contest the will.

4. The execution of the will of Joseph Kajut substantially complied with the applicable provisions of section 2502 of the Probate, Estates and Fiduciaries Code, 20 Pa.C.S.A. §2502, and was properly admitted to probate.

## ORDER

And now, April 3, 1981 the appeal from probate is dismissed.

## MEMORANDUM OPINION

McCORMICK, *P.J.*, November 6, 1981 — Exceptions were filed by contestants to findings of fact,

conclusion of law and the order of April 3, 1981, which dismissed the appeal from probate in this case.

After hearing the arguments and considering the exceptions, the court concludes that the will was executed in a manner which was in substantial compliance with the Wills Act. See the scholarly and persuasive article by Professor John H. Langbein, "Substantial Compliance with the Wills Act," 88 Harv.L.Rev. 489 (1975). The intent of the testator was plain; no useful purpose can be served by destroying the will he created by a technical adherence to the Wills Act, the principal purpose of which is to make certain that the intent of a testator is effectuated.

## ORDER

And now, November 6, 1981, the 17 exceptions filed by Apolonia Kajut Lewandowski and Walter Cashell are hereby dismissed. It is ordered that judgment be entered for the proponents.